ESSEX BOWLING COMPANY, INC. *vs.* ARGYLE REALTY
CORPORATION
(and two companion cases[1]).

Essex.   December 5, 1947. — February 16, 1948.

Present: QUA, C.J., LUMMUS, DOLAN, WILKINS, & SPALDING, JJ.

*Real or Personal Property. Real Property,* Installation of personalty, Bowling alley. *Personal Property,* Installation on real estate, Bowling alley. *Conversion. Evidence,* Of intent, Of ownership of property, Relevancy and materiality.

Detailed evidence respecting the method of building certain stock type bowling alleys in 1917, their sale to a tenant in a building, their installation in the building, that they were not expressly made for that building, that the building had not been erected exclusively to house bowling alleys, that they were not annexed to the building in any manner but rested on their own foundation, and that they could be removed without injury to themselves or to the building, would have warranted a finding that they were personal property owned by the tenant and his successors in title and not by the owners of the building.

A finding, that the owner of a building prevented a tenant, when he was evicted, from removing bowling alleys which were personal property belonging to the tenant and claimed and used the alleys for the owner's purposes, would have warranted a verdict for the tenant in an action against the owner for conversion of the alleys.

A finding that the owner of a building had converted bowling alleys, personal property belonging to a tenant, would not have been warranted where, although the owner had asserted title to the alleys, he

---

[1] The companion cases are by the same plaintiff against Dominic Bonacorsi and Joseph Bonacorsi, executors under the will of Francesco Bonacorsi, and against Grazia Bonacorsi, Ida Bonacorsi, Dominic Bonacorsi, Joseph Bonacorsi, Sarah Giglio, and Nancy Bonacorsi.

never had disturbed the tenant's possession of them nor exercised a control over them inconsistent with the tenant's rights.

On the issue, whether certain bowling alleys, alleged by the plaintiff to have been converted by the defendant, were real or personal property, and to establish the intention of the original purchaser of the alleys as to their relation to the real estate where they were installed, a mortgage of them as personal property by such original purchaser to the seller of the alleys, and a mortgage back to such original purchaser coincidental with a bill of sale from the original purchaser to a subsequent purchaser of them as personal property, should have been admitted in evidence.

As tending to establish title of a corporation to certain personal property, a bill of sale from an alleged prior owner which omitted the name of a grantee should have been admitted in evidence with other evidence to the effect that the person receiving the bill of sale and completing the purchase had requested that the grantee's name be not inserted pending the completion of the incorporation of that corporation.

THREE ACTIONS OF TORT. Writs in the Superior Court dated November 30, 1946.

The cases were tried before *O'Brien*, J.

In this court the cases were submitted on briefs.

*M. Nicholson*, for the plaintiff.

*A. J. Lloyd*, for the defendant Argyle Realty Corporation.

WILKINS, J. In these three actions of tort for the conversion of fourteen bowling alleys [1] the plaintiff's exceptions are to the direction of verdicts for the defendants and to the exclusion of evidence. The alleys occupied an entire one-story building at 48 Essex Street, Lawrence. The building was built in 1916, and the alleys were installed as early as 1917. In 1906 the real estate had been acquired by Charles E. Bradley and William J. Bradley from a corporation known as the Essex Company (which was in no way related to the plaintiff corporation), and the Bradleys gave back a mortgage to the Essex Company. This mortgage was foreclosed on August 29, 1944, and on September 26, 1944, the Essex Company conveyed the real estate to the defendant Argyle Realty Corporation (hereinafter called the Argyle company) by a deed which contained no reference to the alleys. On October 30, 1944, the Argyle company by a con-

---

[1] The declarations also alleged the conversion of an oil burner and certain signs, but the plaintiff has made no argument respecting those allegations, and we treat them as waived.

tract in writing agreed to sell the real estate to Frank Bonacorsi, who was the same individual described as Francesco Bonacorsi in the writ in the second case at bar. The contract contained a provision, "Full possession of the said premises, free of all tenants is to be delivered . . . at the time of the delivery of the deed, the said premises to be then in the same condition in which they now are, and to include the existing bowling alleys." On January 5, 1945, the Argyle company conveyed the real estate to Frank Bonacorsi by a deed which did not refer to the alleys.

The first tenant of the building was the Majestic Company, of which the "owner" was one Delano. By a bill of sale dated February 10, 1937, Delano sold to one Durkin "all personal property belonging to me and constituting the Essex Bowling Alleys located in building numbered 48 Essex Street . . . including . . . fourteen alleys and equipment" and certain enumerated articles. The bill of sale purported to be from the law office of William J. Bradley and to be witnessed by him. There was evidence tending to show that he personally had prepared the bill of sale and had signed as a witness to it, and that he was the same William J. Bradley who was one of the owners of the real estate, subject to the mortgage to the Essex Company.

There was evidence that the Essex Company was in possession of the real estate beginning in June, 1942; that thereafter the Essex Company collected rent from Durkin until September, 1944, and "then" from one Salvatore Zappala; and that the alleys were sold by Durkin to Zappala by a bill of sale dated August 21, 1944. On September 27, 1944, the Essex Company received the rent for that month from Zappala and gave him a receipt. The plaintiff Essex Bowling Company, Inc., was incorporated under the laws of this Commonwealth on October 18, 1944, the incorporators being Salvatore Zappala, Grace Zappala, Mary Barberio, and Michael T. Stella.

Michael T. Stella, Esquire, testified that in 1944 he represented Salvatore Zappala and the plaintiff; that he formed the corporation and obtained the charter; that he represented Zappala in the purchase of the alleys from Dur-

kin; that the bill of sale from Durkin contained the name
of no grantee; that when asked by Durkin's attorney in
whose name the alleys "were to be placed," he stated that
there was a corporation in process of formation for Zappala
and the members of his family, and that it was his desire
that the title to the alleys should vest in the corporation to
be formed; that at the time the bill of sale was made, the
incorporation had not been completed; that after the cor-
poration was formed, Zappala and the witness talked with
one Andrew, the treasurer of the Argyle company; that
Andrew was interested in getting "something written down,
some guarantee" that Zappala would pay the rent; that at
a later conversation among the same persons Andrew said
that he was going to sell the building to someone else because
he did not want a bowling alley there; that they went to
the office of James H. Eaton, Esquire, attorney for the
Argyle company; that Andrew told Mr. Eaton that Zappala
was making a claim to the alleys, and Andrew wanted the
question decided; that Mr. Eaton said that it was his
opinion, after checking it, that the alleys "belonged to the
building" and that "he had authority for his contention";
and that the witness disagreed with him.

Zappala testified that he was president, treasurer, a
director, and an incorporator of the plaintiff; that the bill
of sale from Durkin had been in his possession; that when
Durkin spoke to him about selling the alleys, they went to
Mr. Stella and completed the sale; that the witness "pur-
chased them for a prospective corporation"; that in the
conversation with Andrew the latter said, "Of course you
know the alleys are ours"; that the witness said, "Oh no,
the alleys are mine," and that he had recently bought them;
that Andrew said that the witness had bought nothing;
that in the conversation with Mr. Eaton the latter said that
he could have the alleys provided he put in a floor; that the
witness refused to put in a floor and claimed the alleys; that
he was told he could not take out the alleys unless he agreed
to put in a floor; that he was then notified to move out by
June; that subsequently Mr. Eaton wanted a bond of
$1,500 "to guarantee" that the witness would put in a

floor, and was told that if he signed the bond, he could stay until June and then would have to get out anyway; that later the witness talked with Francesco Bonacorsi, who "claimed the alleys"; and that "he stayed in premises until December 30, 1945, or January 1, 1946, when he was forced out." It was agreed by counsel for the individual defendants in the third case at bar that "they were the owners of the real estate at the time the Essex Bowling Company was evicted from the premises."

Andrew testified that he was treasurer of the Argyle company; that his brother and he were the principal stockholders; that he was one of two in charge of the company's property; that he negotiated the sale to "the Bonacorsis"; that he talked with Zappala and Mr. Stella; that Zappala stated that he had acquired the alleys; that he told Zappala that the latter had been foolish to buy the alleys as they belonged to the witness and not to the man who sold them; that the alleys belonged to the Argyle company; that he later told Zappala he could not stay; that, so far as the alleys were concerned, the Argyle company was interested only in having a proper floor; that Mr. Eaton was counsel for the Argyle company and also for the Essex Company; that he asked Mr. Eaton whether the Essex Company "claimed" that the alleys belonged to it, and was told that the Essex Company did not "claim" the alleys; that on October 30, 1944, the Argyle company entered into a contract for the sale of the building including the alleys; that later a deed was given to "the Bonacorsis," and the witness assumed that the deed included the alleys; that at some time in the negotiation with "the Bonacorsis" the question of title to the alleys was raised; and that the witness talked with his lawyer, who told him that the alleys were part of the building, and that if the witness conveyed the real estate, he thereby would convey the alleys to "Mr. Bonacorsi."

Joseph Bonacorsi testified that he was one of the sons of Frank Bonacorsi and one of the latter's executors; that his mother was Grazia Bonacorsi and the other defendants in the third case at bar were his brother and sisters; that his father left all his property to his widow and children; that

the witness acted for his father in the purchase of the property and negotiated with Andrew; that his brother was at the negotiations; that Andrew said that he owned the real estate and the alleys; that Andrew said the alleys belonged with the building and the witness demanded that the alleys be included in the agreement; that the witness wanted to use the alleys for flooring for his business; that he understood he bought the alleys from the Argyle company; that he ripped out the gutters and finished the space with pine flooring; that a Mr. Albert represented the "Bonacorsis" and started eviction proceedings in a District Court; that Zappala went to the witness's house and told "the Bonacorsis" that he wanted to take the alleys out, and the witness said that he had bought them and Zappala could not take them out; that on December 6, 1945, "the Bonacorsis were successful in getting Essex Bowling Company out by a process started by their attorney"; that then the gutters were taken out and replaced with flooring; and that when Zappala was evicted, the alleys were still there.

Dominic Bonacorsi testified that his brother and he acted for his father in the purchase of the real estate; that Andrew told him the alleys went with the building and put it in the agreement; that his father after a talk between the witness and Zappala brought a bill in equity to prevent Zappala from touching the alleys; and that "the alleys are still in the premises in modified form, that is, they are flooring now."

In the bill in equity, which was filed January 13, 1945, Frank Bonacorsi was the plaintiff and Zappala the defendant. On January 22, 1945, Essex Bowling Company, Inc., the plaintiff in the present cases, was substituted as party defendant, and later filed an answer. Apparently the last step in the suit was the filing of a stipulation in which Essex Bowling Company, Inc., agreed not to remove the alleys without court order.

1. At the outset there is the question of the plaintiff's right to sue, which, however, does not arise in the second and third cases at bar, because in them it was agreed at the pre-trial hearing that no question was "to be raised as

to the Essex Bowling Company, Inc., being the proper plaintiff and if the alleys . . . were personal property that they were owned by it." But no such agreement was made in the case against the Argyle company, which now contends that the plaintiff failed to prove that it was the "owner" of the alleys. Since the Argyle company is entitled to prevail on another ground, we need not consider this contention or determine whether the plaintiff could not have been found to have had a possession which was sufficient to enable it to sue. See *Belli* v. *Forsyth*, 301 Mass. 203, 204–205; *New England Box Co.* v. *C & R Construction Co.* 313 Mass. 696, 707–708.

2. The next question is whether the alleys could have been found to be personal property. We think that the evidence warranted such a finding. The architect and engineer employed by the Bradleys for the erection of the building testified that the building was constructed so that it could be used for a store, dance hall, skating rink, bowling alley, or "any other purpose"; that the plans called for a building "aside from the alleys"; that on top of a spruce flooring there was furring so that "if alleys were going in, it would be furred up so that the surrounding floor would come flush with the alleys"; that he left spacing for the seven pairs of alleys to fit into and constructed his own finish flooring around the alleys; that there were variations in the plans so that if the building was to be used as a store, all one had to do was remove the furring, go back to the original lining floor, and place "finish floor" on that over the entire area; and that this could be done without any destruction to the building.

A salesman for the Brunswick-Balke-Collender Company, which had sold the alleys to the first tenant in 1916, testified that he knew how alleys are constructed and was familiar with those in question; that "there are no different types of alleys," but the foundations are different; that all Brunswick alleys are constructed alike, and are stock alleys; that the alleys in question are stock alleys; that their foundation is a cross-crib foundation; that a cross-crib foundation is "made by setting 2 x 4's on edge

cross one another"; that after the pit at the rear is installed, the alley bed stock is shipped by the piece in one inch boards, which are tongued and grooved on the sides and are two and three-fourths inches thick; that the alley strips are nailed and glued together so that the bed becomes one solid piece; that the alley is built up to the requisite height and dropped on the foundation, which has a plaster board covering; that the alley is then drilled and large wooden screws are attached to the foundation; that they are in no way attached to the building; that the lower piece of the foundation does not have to be attached to the floor because the weight of the alleys holds them down; that the only attachment is to the foundation built with the alley and not to the building; that the floor surrounding the alley beds is in no way annexed to any part of the alley; that the gutters, made in three pieces, lie on the foundation; that the alleys each weigh about three tons excluding the foundation; that these alleys are removable without injury to the building and that the damage to the alleys on removal would be negligible, "that is a little gutter stock"; that the alley bed is rock maple, a very hard wood, but the gutter stock is pine; that the alleys could be replaced in another building; that all parts of the alleys are manufactured as general stock parts, and "they adjust them to different layouts, that is, they add flooring"; that "if these alleys were a miniature, you could lift the whole thing right up"; that no part of the alley becomes part of the building; that alleys can be removed in one section with riggers and by rollers, taking up the bed in one piece; that the foundation is in sections and can come out piece by piece; "there is no job at all to do it"; and that all that is needed to remove an alley is to remove the three pieces of gutter, remove screws, and "tip it right up," using only men and rollers.

On the foregoing evidence it was for the jury to say whether the alleys were personal property. *Commercial Credit Corp.* v. *Commonwealth Mortgage & Loan Co. Inc.* 276 Mass. 335, 338. *Nadien* v. *Bazata,* 303 Mass. 496, 499, and cases cited. *General Heat & Appliance Co.* v. *Goodwin,*

316 Mass. 3. The alleys were not made for the building, nor was the building erected exclusively to house them. They could be removed without injury to themselves or to the building, to which they were not annexed in any manner, but rested upon their own foundation.

3. We proceed to the next point, which is whether there was evidence warranting a finding of a conversion in any of the cases.

In the third case at bar, the defendants Bonacorsi, who acquired title through the death of Frank Bonacorsi, it could have been found, evicted the plaintiff from the building, where, the gutters having been removed, the alleys were used as flooring at the time of the trial. It also could have been found that these defendants prevented the plaintiff from removing the alleys, claiming them as their own. This was ample to warrant the conclusion that these defendants excluded the plaintiff from the possession of the alleys and exercised a control over them inconsistent with the plaintiff's right. *Jean* v. *Cawley*, 218 Mass. 271, 277–278. *Jackson* v. *Innes*, 231 Mass. 558. *Lawyers Mortgage Investment Corp. of Boston* v. *Paramount Laundries Inc.* 287 Mass. 357, 360. *Geguzis* v. *Brockton Standard Shoe Co.* 291 Mass. 368, 370–371. *Brown* v. *General Trading Co.* 310 Mass. 263, 268–269. See *Edgerly* v. *Whalan*, 106 Mass. 307, 308.

The cases against the defendants in the first and second cases stand on a different footing. The plaintiff's possession continued until its eviction, and suffered no interruption as a result merely of the acts of the Argyle company and of Frank Bonacorsi, neither of whom was ever in possession. A finding of a conversion would not have been warranted against them. *Forth* v. *Pursley*, 82 Ill. 152, 155. *Davis* v. *Buffum*, 51 Maine, 160. *Western Maryland Dairy, Inc.* v. *Maryland Wrecking & Equipment Co.* 146 Md. 318, 329. *Heighes* v. *Dollarville Lumber Co.* 113 Mich. 518. *Burnside* v. *Twitchell*, 43 N. H. 390, 392. *Williams* v. *Fethers*, 115 Wis. 314, 317. See *Wilson* v. *Cummings*, 4 Misc. (N. Y.) 429. In *Stone* v. *Livingston*, 222 Mass. 192, it does not clearly appear that the defendant sold

property in the possession of the plaintiff, and this particular question was not considered.

4. Certain questions of evidence, which might arise at a new trial, remain for consideration.

The judge excluded a certified copy of the records of the city clerk of Lawrence of a mortgage of personal property, dated December 6, 1916, covering the alleys in question, given to Brunswick-Balke-Collender Company by the Majestic Company, the first tenant of the premises and the original purchaser of the alleys, which caused them to be put into position in the beginning. "In cases of this kind every fact and circumstance should be considered which tends to show what intention, in reference to the relation of the . . . [article] to the real estate, is properly imputable to him who put it in position." *Hopewell Mills* v. *Taunton Savings Bank,* 150 Mass. 519, 522, where it was also said, "It is an intention which settles, not merely his own rights, but the rights of others who have or who may acquire interests in the property." The copy of the recorded mortgage was admissible to show that intention. *Wentworth* v. *S. A. Woods Machine Co.* 163 Mass. 28, 33. *Jennings* v. *Vahey,* 183 Mass. 47, 49. *Smith* v. *Bay State Savings Bank,* 202 Mass. 482, 487. *Stone* v. *Livingston,* 222 Mass. 192, 195–196. *Noyes* v. *Gagnon,* 225 Mass. 580. See *Maguire* v. *Park,* 140 Mass. 21; *Medford Trust Co.* v. *Priggen Steel Garage Co.* 273 Mass. 349, 354; *Walker Dishwasher Corp.* v. *Medford Trust Co.* 279 Mass. 33, 35; *Titcomb* v. *Carroll,* 287 Mass. 131, 137. It also was error to exclude a personal property mortgage covering the alleys dated February 10, 1937, from Durkin to Delano and another. While this could not have changed the nature of the alleys if they had already become realty, it was some evidence of the intention of the original owner to the contrary. *Titcomb* v. *Carroll,* 287 Mass. 131, 137. This is not a case of a prior nonassenting mortgagee, as the Essex Company never claimed the alleys. See *Hannah* v. *Frawley,* 285 Mass. 28, 30.

The bill of sale, dated August 21, 1944, from Durkin, in which the name of the grantee was omitted in the circumstances testified to by Zappala and Mr. Stella, should have

been admitted in evidence. It was a material fact in the proof of the plaintiff's claim of ownership or of right to possession.

The other questions of evidence we do not consider, as it does not seem likely that they will arise at another trial.

5. It follows that in the action against the Argyle Realty Corporation and in the action against Dominic Bonacorsi and Joseph Bonacorsi, executors under the will of Francesco Bonacorsi, the exceptions are overruled, but that in the action against Grazia Bonacorsi, Ida Bonacorsi, Dominic Bonacorsi, Joseph Bonacorsi, Sarah Giglio, and Nancy Bonacorsi, the exceptions are sustained.

*So ordered.*